

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 05-21916CIV-DUBÉ

In the Matter of the Extradition

of

SARKIS GARABET SOGHANALIAN

_____/

## MOTION TO DISMISS EXTRADITION PROCEEDING AND MEMORANDUM OF LAW

Sarkis Garabet Soghanalian, through counsel, moves that the Court dismiss the

pending extradition warrant and proceeding currently being prosecuted by the United States

under the EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE

REPUBLIC OF COLOMBIA, Sept. 14, 1979, Senate Treaty Doc. No. 97-8, 1979 U.S.T. LEXIS

199 (hereafter "TREATY"), based upon the failure of Colombia to comply with the

requirements of the TREATY:[1]

    1.    Colombia has failed to perfect its TREATY obligation by providing the "required documents," under TREATY, art. 9, including "an indictment or its equivalent issued by a judge or other judicial authority of the Requesting State," TREATY art. 9(3)(a);

    2.    Colombia has failed to perfect its TREATY obligation to provide the "texts of

---

[1] The government concedes that Colombia has failed in its obligation to establish probable cause for extradition, TREATY, art. 9(2)(a), see infra at 29 & Transcript of May 25, 2006 Status Conference, DE 38 at 3 (AUSA acknowledges "there is a lack of probable cause" in the documents before the court) but that deficiency is not the subject of this present motion. The present motion to dismiss is addressed solely to the failure of Colombia to meet the procedural requirements of the TREATY. The substantive probable cause question will be raised and briefed in a separate motion if the proceeding is not dismissed by the Court or voluntarily dismissed by the government, as government counsel suggested at the last status conference. See infra at 29.

Rec'd In MIA Dkt 8/17/06

laws describing the essential elements and the designation of the offense for which extradition is requested," as required by TREATY, art. 9(2)(c);

3.    Colombia has failed to perfect its TREATY obligation because the offense alleged in its Indictment is not an "extraditable offense" in that the crime charged is not "punishable under the laws of both Contracting parties" or "under the Federal laws of the United States," as required by TREATY, art. 2 (1)(a)&(b), (3) and art. 1(2)(a);

4.    Colombia has failed to perfect its TREATY obligation to provide accurate translations of the documents it is required to file, Treaty, art. 9 (5).

5.    Colombia has failed to demonstrate that the offense alleged in its Indictment is not simply a political or military offense, for which extradition is barred by the TREATY, art. 4;

## ARGUMENT

The United States' authority to surrender alleged fugitives to foreign lands is constrained by statute and specific extradition treaty obligations. 18 U.S.C. § 3181(a). As former Chief Judge Roettger aptly observed:

> [U]nlike interstate extradition, which is provided for in Article 4, s 2 of the Constitution, there is no inherent requirement of international extradition. Any right of the requesting country to seek extradition, and any requirement that the asylum country extradite fugitives is created and governed by the extradition treaty; "to determine the nature and extent of the right, we must look to the treaty which created it." Factor v. Laubenheimer, 290 U.S. 276, 287, 54 S. Ct. 191, 193, 78 L.Ed. 315 (1933).

McElvy v. Civiletti, 523 F. Supp. 42 (S.D. Fla. 1981).

When a bilateral extradition treaty exists, as it does here, it governs the proceedings between those two nations. M. Bassiouni, International Extradition: United States Law and Practice 69 (4th ed. 2002). Such treaties are self-executing and take precedence over any other provisions of law. Id.; 6 M. Whiteman, Digest of International Law 734 (1968). The

language of the treaty controls and must be applied by the courts as written. See In re Commissioner's Subpoenas, 325 F.3d 1287, 1294 (11th Ci. 2003) ("[i]f the language of the treaty is clear and unambiguous . . . our analysis ends there and we apply the treaty as written")(quoting United States v. Duarte-Acero, 208 F.3d 1282, 1285 (11th Cir. 2000)).

The present proceeding, to effect an extradition from the United States to Colombia at the request of Colombia, is governed by the bilateral EXTRADITION TREATY BETWEEN THE UNITED STATES OF AMERICA AND THE REPUBLIC OF COLOMBIA, Sept.14, 1979, Senate Treaty Doc. No. 97-8, 1979 U.S.T. LEXIS 199, a copy of which has been filed by the government in this cause. DE 24. As detailed below, Colombia has failed to meet its TREATY obligations in a number of ways, covering the breadth of the TREATY's requirements, disentitling that country from extradition in this case. International Extradition at 69 ( "[t]he judiciary. . . has the authority to enjoin the federal government from extraditing a person if the extradition is in violation of . . . the applicable treaty") (citing J. Moore, A Treatise on Extradition and Interstate Rendition 97 (1891)).

**A.  Colombia has failed to perfect its TREATY obligations by providing the "required documents," under TREATY, art. 9, including "an indictment or its equivalent issued by a judge or other judicial authority of the Requesting State," TREATY art. 9(3)(a).**

The TREATY requires:

>    (3)   When the request for extradition relates to a person who has not been convicted, it shall be accompanied by:
>                              * * *
>          (a)   A copy of the indictment or its equivalent issued by a judge or other judicial authority of the Requesting State;

Id., art. 9, sec. 3(a). An indictment issued by a judicial authority is "signed by a judge or

other judicial authority." Id., art. 9, sec. 6(b).

Colombia has failed to perfect its treaty obligations to provide an indictment which is issued by a judge or other judicial authority. In this case Colombia has provided an indictment – 70 un-paginated pages containing hundreds of numbered and un-numbered paragraphs – written and signed by a "special prosecutor," not a judge or judicial authority as required. The Indictment, a copy of which is included in the government's filing made in this Court on September 27, 2005, is signed "Luis Isnardo Barrero Barrero, Fiscal 12 Especializado," which translates to: "Luis Isnardo Barrero Barrero, Special Prosecutor." Nothing within the filing before this Court defines the role of a "special prosecutor" or equates that position to a judge or judicial authority. As is demonstrated below, a "special prosecutor" is an employee of the Executive Branch of Colombia's government, is not a judge or judicial authority, and is constitutionally prohibited from exercising judicial authority.

The CONSTITUTION OF COLOMBIA[2] divides the government into separate branches, much in the way the U.S. Constitution does. Title V (Concerning the Organization of the State) delineates a number of specific branches, including the Legislative Branch (Title VI), the Executive Branch (Title VII), and the Judiciary Branch (Title VIII). Courts and judges

---

[2] The government has not filed a copy of the CONSTITUTION OF COLOMBIA in the present case. Counsel for Mr. Soghanalian relies upon a complete translation of that document, which is found at http://www.olarteraisbeck.com/portal/LegislationCaseLaw/copyright_html/article-61-constitution-of-colombia_html/#constitution. This copy is admissible for purposes of the present motion: "A party may submit 'any other information concerning foreign law that is believed to further his cause, including secondary sources'" and the trial judge is free to accord them appropriate probative value. Greene v. Le Dorze, 1998 WL 158632, *3 (N.D. Tex. 1998), quoting 9 Wright & Miller, Federal Practice and Procedure § 2444, at 645-46 (1995).

are enumerated in Title V, art. 116, and the National Attorney General and prosecutors are enumerated separately, as part of the Executive's Public Ministry. Id., art. 118. The Colombian Constitution directs a specific separation of powers, not unlike that which exists under U.S. law: "No authority of the state may exercise functions different from those assigned to it by the Constitution and the law." CONSTITUTION OF COLOMBIA, Title V, art. 121.

Mr. Barrero Barrero is a "special prosecutor." The heading of the indictment he signed is entitled:

PROSECUTION SERVICE
REPUBLIC OF COLOMBIA
NATIONAL ANTI TERRORIST UNIT
Office 12

DE 24.[3] His signature on the last page of the indictment reads:

/s/
LUIS ISNARDO BARRERO BARRERO
SPECIAL PROSECUTOR

DE 24. Thus, the sole signatory to the indictment is not a judge or judicial authority. The fact that the sole signer of the indictment is not a judge or judicial authority is confirmed by other documents filed by the government in this Court: The "Request for Extradition" bears the heading "National Antiterrorism Unit, Prosecutor 12" and "Prosecution Service, National

---

[3] The translation of the Indictment before the Court is actually inaccurate in many respects, including its title. The original Spanish document is entitled "Fiscalia General de la Nacion," which translates to "Office of the Attorney General," not to "Prosecution Service." This translation error is not significant, though, since the office of the National Attorney General is constitutionally enumerated as part of the Public Ministry, Title V (Concerning the Organization of the State), art. 117-18, not part of the courts. Id., art. 116. The work of the ministries is an executive function, subject to the powers of the President, who assigns their work. Title VII (Concerning the Executive Branch), art. 189, sec. 17.

Antiterrorism Office." <u>Id.</u> It contains a letter on letterhead of the "Prosecution Service, Anti-Terrorist Unit, Prosecutor 12," and is signed "Luis Isnardo Barrero Barrero, Special Prosecutor 12." <u>Id.</u> A "Certification" of the Coordinator, National Anti-Terrorism Unit, contained on the last page of documents, behind translations of Colombian statutes, confirms that Mr. Barrero-Barrero is simply a special prosecutor, not a judicial authority. It reads, in part:

PROSECUTION SERVICE
OFFICE OF THE ATTORNEY GENERAL
ANTI-TERRORISM UNIT

CERTIFICATION

. . . I CERTIFY that Luis Isnardo Barrero-Barrero is attached to this Unit as Prosecutor seconded to the Bogota Special Criminal Courts.[4]

DE 24.

Mr. Barrero Barrero is an Executive Branch functionary who does not qualify as a judicial authority and is constitutionally prohibited from exercising judicial authority. CONSTITUTION OF COLOMBIA, Title V, art. 121. The indictment before the Court is, therefore, insufficient to permit an extradition proceeding under the TREATY and must be dismissed.[5]

---

[4] The Colombian government's translator translated "ante" as "seconded to," although the Federal Public Defender's translator believes the correct translation in this context is "before," as in "is attached to this Unit as Prosecutor <u>before</u> the Bogota Special Criminal Courts."

[5] <u>Afanasjev v. Hurlburt</u>, 418 F.3d 1159 (11th Cir. 2005), addressing the sufficiency of evidence of probable cause for extradition to Lithuania, is inapposite here due to the dramatically different bilateral extradition treaties the U.S. has with Lithuania and Colombia. The bilateral Lithuania-U.S. treaty contains no specific requirements for the Requesting State's filings, in particular it makes no requirement that there be an indictment, no less that it be signed by a judge or judicial authority. <u>See</u> 1934 U.S.T. LEXIS 83. The bilateral Colombia-U.S. extradition treaty, on the other hand, has very specific requirements, including the need for the Requesting State to file an indictment signed by a judge or judicial authority, as detailed above. The two bilateral treaties are very different, and in each proceeding the court must "apply the words of the treaty as written," <u>In re Commissioner's Subpoenas</u>, 325 F.3d at 1294, which explains why the requirements here are more strict. Thus, what might have been acceptable under the treaty between Lithuania and the U.S.

**B.     Colombia has failed to perfect its Treaty obligation to provide the "texts of laws describing the essential elements and the designation of the offense for which extradition is requested," as required by TREATY, art. 9(2)(c).**

Article 9, sec. 2 of the TREATY requires that:

> (2)    The request for extradition shall be accompanied by:
>
> \* \* \*
>
> (c)    The texts of the laws describing the essential elements and the designation of the offense for which extradition is requested;
>
> (d)    The texts of laws describing the punishment for the offense; and
>
> (e)    The texts of the laws describing the time limit on the prosecution or the execution of punishment for the offense.

The TREATY also provides that "All the documents to be submitted by the Requesting State in accordance with Articles 9 and 10 of this Treaty shall be translated into the language of the requested State." Id. at (5). Colombia has failed to fulfill its obligations under each of these provisions.

Colombia has failed to provide the text for the offenses charged. The indictment names Mr. Soghanalian "as possibly responsible for the offenses of CONSPIRACY TO COMMIT AN OFFENCE AND TRAFFICKING IN ARMS RESERVED FOR THE USE OF THE ARMED FORCES" during 1998-99.[6]  The text of neither law is before the Court. Instead, Colombia has offered a translation of a conspiracy law as it exists years later, in 2002. As to "Conspiracy to commit an offence," the papers filed with this Court are prefaced with the notation, "Art. 340-Modified. Law 733 of 2002, art. 8." There is no explanation of

---

has no bearing on the treaty requirements between Colombia and the United States.

[6] The indictment against Mr. Soghanalian details conduct beginning in 1998, Indictment ¶ 2, and during 1999, through August, 1999. Id. at ¶ 6-10. The Indictment is dated December 30, 2004. Id.

the nature of the modification or whether it affected the elements of the offense, its statute

of limitations, or prescribed punishment. And since the elements and prescribed punishment

directly affect the applicable statute of limitations under Colombian law, these details are

especially pertinent in a case in which the indictment against Mr. Soghanalian was returned

over five years after the alleged crime, the default statute of limitations in Colombia.[7]

The text of the other crime alleged is also inadequate. According to the Indictment

itself, the crime of "TRAFFICKING IN ARMS RESERVED FOR THE USE OF THE

ARMED FORCES" is based not only on Penal Code art. 366, but also on a separate Decree

and the Constitution:

> It must be clarified that the possession of this type of armament [AKM
> Kalashnikov rifles] is regulated in our country by Decree 2535 of 1993 and the
> Constitution, which provides the State the monopoly over the production, trade
> and possession of this type of armament, establishing exceptions which are
> subject to compliance with provisions of the law."

Indictment at un-numbered page 69. Apparently, there is no specific designation in

Colombian law reserving AKM Kalashnikov rifles solely to the use of the armed forces;

rather this is a matter of prosecutorial interpretation. Indeed, the Indictment implicitly

concedes that the firearms at the heart of the charges, AKM Kalashnikov rifles, are not

specifically reserved to the use of the armed forces, but this is merely the prosecutor's

interpretation of the Decree:

---

[7] Colombian law places a time limitation on prosecution and imprisonment, akin to the U.S. statute of limitations. Denominated "extinction" under Colombian law, it extinguishes the legal action if the "term of prescription of criminal action" has expired. Under Colombian law the statute of limitations is five years, unless the term of punishment exceeds five years, in which case the limitations period is equal to the possible sentence. But if the punishable conduct "attracts punishment other than imprisonment" the limitations period remains not more than five years. See Penal Code, ch. V, art. 82-84.

> According to the facts already mentioned, Articles 9 and 10 of the Decree 2535/98 include the characteristics that a weapon must have, in order to be considered suitable for private or personal use, indicating that maximum caliber is 9.652 mm., maximum length of the barrel 15.24 cm; for repeater or semiautomatic pistols with a magazine capacity of the of more than 9 cartridges.
>
> Therefore, according to the information given in the proceedings mentioned above, considering the characteristics of the arms in this investigation, they exceed the reference characteristics of Article 9 mentioned above and should be considered as reserved for the use of the armed forces.

Indictment at un-numbered page 70. Despite the statement contained in the Indictment about "facts already mentioned," neither the Indictment nor any of the other accompanying papers filed in this Court provide any specifics to support a claim that the subject rifles are reserved to the use of the military under Colombian law. To the contrary, throughout the Indictment the prosecutor alleges the transaction at issue involved "AKM 47 Cal. 7.62 mm rifles" or "7.632 mm rifles,"[8] either of which is actually within the caliber that the Indictment says the decree permits for non-military use – those smaller than "9.652 mm." On the face of the Indictment, therefore, the subject arms were not reserved for the use of the armed forces.

In addition, according to the Indictment the Decree allows "exceptions." The exceptions are not set forth in the government's papers and, as indicated above, neither the Decree nor a translation of the Decree has been filed in this Court. This deficiency is particularly important here since exceptions would likely apply to someone like Mr. Soghanalian, who, as the Indictment notes, is "an international arms salesman," "a permanent

---

[8] Reference to the caliber of 7.62mm or 7.632mm is contained in paragraphs throughout the Indictment, e.g., FACTS paragraphs 6, 9 and 16; EVIDENCE paragraphs 1, 10, 16, 17 and 164, and in the un-numbered paragraphs under OFFENSES.

CIA collaborator," who was selling surplus arms from the King of Jordan "at the request of the Jordanian government" and which were only sold after he "asked for permission from U.S. authorities" and "getting approval." Indictment, ¶ 141.

Neither Decree 2535 of 1993, nor the Constitutional provision on which the Indictment relies, has been filed in this Court, in either English or Spanish. Yet the very substance of the charges depends on whether the subject firearms are properly designated under Colombian law as arms reserved to the use of the armed forces, and that they do not fall within one of the exceptions to the Decree and Constitution. Colombia's failure to file the proper papers required by the TREATY is significantly problematic because it deprives this Court of the ability to fulfill its designated function to determine if the Indictment states a crime and whether the prosecution was brought within the applicable statute of limitations. Absent a properly alleged crime and timely prosecution, there can be no extradition. TREATY, arts. 1& 3 (permitting extradition only for extraditable offenses); art. 6 (prohibiting extradition when applicable statute of limitations lapsed before prosecution commenced).

**C.    Colombia has failed to perfect its TREATY obligation because the offense alleged in its Indictment is not an "extraditable offense" in that the crime charged is not "punishable under the laws of both Contracting parties" or "under the Federal laws of the United States," as required by TREATY, art. 2 (1)(a)&(b) and art. 1(a)(2).**

Article 2 of the TREATY permits extradition only for extraditable offenses:

> (1)    Extraditable offenses under this Treaty are:
>> (a)    Offenses described in the Appendix to this Treaty which are punishable under the laws of both Contracting Parties; or
>> (b)    Offenses, whether listed in the Appendix to this treaty or not, provided they are punishable under the federal laws of the United States and the laws of the Republic of

Colombia

\* \* \*

(4)     Subject to the conditions set out in paragraphs (1), (2),
        and (3) extradition shall also be granted:
        (a)     . . . Extradition shall also be granted for association to
                commit offenses as provided by the laws of Colombia . . .

The plain language of the TREATY requires dual criminality, that is, that the charged crimes in the Requesting State must also be crimes in the asylum state. The dual criminality requirement exists for both substantive and conspiracy crimes. Id., art. 2(1)&(4). Absent dual criminality, the offense is not extraditable. TREATY, art. 2; United States v. Gallo-Chomorro, 233 F.3d 1298, 1306 (11th Cir. 2000).

Dual or "'[d]ouble criminality' is in effect a reciprocity requirement which is intended to ensure each of the respective states that they (and the relator) can rely on corresponding treatment, and that no state shall use its processes to surrender a person for conduct which it does not characterize as criminal." United States v. Gallo-Chamorro, 48 F.3d 502, 507 (11th Cir.1995) (citing United States v. Herbage, 850 F.2d 1463, 1465 (11th Cir.1988) (quoting M. Bassiouni, International Extradition: United States Law and Practice, vol. 1, ch. 7, sec. 3, pp. 324-25 (2d rev. ed. Nov. 1987)). When a treaty contains a dual criminality requirement, "no state shall use its processes to surrender a person for conduct which it does not characterize as criminal." United States v. Gallo-Chomorro, 233 F.3d 1298, 1306 (11th Cir. 2000) (quoting Herbage, 850 F.2d at 1465 and International Extradition 324-25)). "Dual criminality mandates that a prisoner be extradited only for conduct that constitutes a serious offense in both the requesting country and the surrendering country." Gallo-Chomorro, 233 F.3d at 1306.

The question of dual criminality is not resolved simply by the conclusion of the Requesting State that it exists, nor is it established if the asylum state concedes it, but rather the extraditee has standing to raise the question de novo in the courts of the asylum country. Gallo-Chomorro, 233 F.3d at 1306. Thus, Mr. Soghanalian has standing to raise, and this Court has authority to decide, the dual criminality issue that is so critical to the extraditability of the pending charges.

The crimes charged here are that Mr. Soghanalian trafficked and conspired to traffic in AKM 47 rifles, which are reserved for the use of the armed forces: "He who without permission of the competent authority imports, traffics, manufactures, repairs, stores, keeps, acquires, or supplies weapons or ammunition reserved for the use of the armed forces . . ." or "when several persons conspire in order to commit an offense" violates the Colombian Criminal Code. Indictment, at un-paginated page, 25 pages from the first) (emphasis added).

The crux of the crimes is that the subject firearms are reserved to the exclusive use of the armed forces; they cannot be used by others without permission of the armed forces. No such crime exists in the United States. Matter of Extradition of Mainero, 990 F. Supp. 1208, 1217 (S.D. Cal. 1997) ("the Court finds that the offense of carrying a firearm exclusive to the Army, Navy and Air Force lacks dual criminality and petitioner fails in its burden regarding extradition on that matter"). In Mainero, the extraditee was charged in Mexico with murder, criminal association, and carrying a firearm exclusively reserved for the military. He challenged dual criminality, a question that the court addressed twice, first at his bond hearing and then again when deciding not to extradite for that offense. As early as the bond

hearing, the court noted that dual criminality was lacking, analogizing a crime involving the

same type firearm at issue here:

> By analogy, in the related extradition proceeding concerning Alfredo
> Hodoyan-Palacios, Mr. Palacios' possession of an AK-47 (a weapon generally
> characterized as an assault weapon) was not sufficient to support a criminal
> charge in the United States absent the fact that he was a drug user. <u>Simply
> stated, the Court finds that possession of firearms reserved for the military is
> not an offense that is covered by the firearms statutes of the United States,
> including the statutes of the State of California, and therefore, it is highly
> unlikely that the dual criminality test could be satisfied in this case.</u> At this
> stage, therefore, the Court would find that Mr. Valdez has a high probability
> of success with regard to the dual criminality issue relative to the firearm's
> charge.

<u>Matter of Extradition of Emilio Valdez Mainero</u>, 950 F.Supp. 290, 296 (S.D.Cal. 1996)

(emphasis added). In subsequently deciding the merits of the issue, the court converted its

skepticism into a direct conclusion that the crime charged lacks dual criminality because no

comparable crime exists in the United States:

> For the reasons set forth in the Memorandum Decision Denying Bail (see
> footnote 1), <u>the Court finds that the offense of carrying a firearm exclusive to
> the Army, Navy and Air Force lacks dual criminality and petitioner fails in its
> burden regarding extradition on that matter.</u>

<u>Mainero</u>, 990 F. Supp. at 1217 (emphasis added).

Indeed, a federal law reserving firearms to the exclusive use of the military, or to use

only with permission of the military, would violate the Second Amendment to the United

States Constitution: "A well regulated Militia, being necessary to the security of a free State,

the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend.

II. The Second Amendment limits the federal government's efforts to control the right to bear

arms. <u>Presser v. Illinois</u>, 116 U.S. 252, 265, 6 S. Ct. 580, 584 (1886) (Second Amendment

is a limitation "upon the power of congress and the national government"); Bach v. Pataki, 408 F.3d 75, 84 (2d Cir. 2005) ("we hold that the Second Amendment's 'right to keep and bear arms' imposes a limitation on . . . federal . . . legislative efforts"). The Bach court noted that "Presser stands for the proposition that the right of the people to keep and bear arms, whatever else its nature, is a right . . . against the federal government . . . ." 408 F.3d at 85. The courts are uniform in this interpretation: See Cases v. United States, 131 F.2d 916, 921 (1st Cir.1942) ("the only function of the Second Amendment [is] to prevent the federal government . . . from infringing that right."); Peoples Rights Org., Inc. v. City of Columbus, 152 F.3d 522, 539 n.18 (6th Cir.1998) ("the restrictions of the Second Amendment operate only upon the Federal Government."); Fresno Rifle and Pistol Club, Inc. v. Van De Kamp, 965 F.2d 723, 731 (9th Cir.1992) ("we affirm the district court's decision 'that the Second Amendment stays the hand of the National Government'"); see also Hamilton v. Accu-tek, 935 F.Supp. 1307, 1318 (E.D.N.Y.1996) ("[T]he Second Amendment limits only the power of Congress.").[9]

In contrast to the United States' Second Amendment, the Colombian Constitution prohibits the right to bear arms, except with the government's permission:

> The government alone may make available and manufacture weapons, war munitions, and explosives. No one may own them nor bear arms without permission from the competent authority. Notwithstanding, a permit will not avail to allow a person to bear arms at political rallies, elections, or public sessions or assemblies, whether that person is attending or directing such a meeting. The members of the national security organs and other official armed

---

[9] The courts are also uniform in holding that the Second Amendment does not apply to the states. The TREATY, however, requires dual criminality with the "Federal laws of the United States," so the Second Amendment's impact on the federal government is the only relevant factor.

> bodies of a permanent character, created or authorized by the law, may bear
> arms under the control of the government, in accordance with the principles
> and procedures that the former stipulates.

CONSTITUTION OF COLOMBIA, Title VII (Concerning the Executive Branch), ch. 7 (Concerning the Public Force), art. 223. The laws of each nation reflect the requirements of their respective constitutions, yet the two constitutions are fundamentally diametrically opposed to each other on the right to manufacture, own and bear arms. It is no surprise, therefore, that Colombia should punish criminally violations of its national monopoly on guns, a monopoly that cannot constitutionally exist under U.S. federal law. And this is precisely why one cannot escape the conclusion that the crimes charged here lack dual criminality.

Constitutional limitations have a direct impact on dual criminality. Just as the Second Amendment makes dual criminality constitutionally impermissible here, the First Amendment has prevented a finding of dual criminality in a case in which France sought extradition in a fraud case. In re France Extradition of Sauvage, 819 F. Supp. 896 (S.D. Cal. 1993). France sought to have Sauvage extradited from the United States under the 1909 bilateral treaty in force between the two nations, a treaty that requires dual criminality. France alleged that Sauvage swindled French citizens in a faith-healing scheme, soliciting and obtaining funds in return for religious blessings. Sauvage contended that the French criminal law punishes conduct protected by the First Amendment and as a result there was no dual criminality. The U.S. court noted that such a crime is constrained in this country by the Constitution: "If the government were to obtain fraud convictions of persons who solicit

funds in return for religious blessings, the guarantees of free exercise of religion under the First Amendment to our Constitution would be in serious jeopardy." Id. at 901. Relying on the Supreme Court's decision in United States v. Ballard, 322 U.S. 78, 81-82 64 S. Ct. 882. 883-84 (1944), the Sauvage court held that "the First Amendment would preclude conviction of Sauvage in the United States for fraud unless it were established that he did not honestly and in good faith hold a belief that he had been given the power by God to heal through prayer and that he could actually heal the people solicited." 819 F. Supp. at 902. Because "[t]he First Amendment . . . precludes the court from examining the truth of Sauvage's beliefs." id. at 904, the court denied extradition, finding that the crime, as alleged, proscribed activity that the U.S. Constitution protects. Id. at 902-04.

Absent dual criminality as to the substantive crime, there can be no dual criminality as to the conspiracy charge. Under the TREATY, art. 2, sec. (4), the dual criminality of the conspiracy count is conditioned on the dual criminality of the underlying substantive count. Extradition for criminal association is "[s]ubject to the conditions set out in paragraphs (1), (2), and (3)" the sections under which dual criminality is determined for substantive offenses. In Colombia, as in the United States, a conspiracy charge cannot be free-standing; the conspiracy or criminal association must be to commit a separate substantive offense. See Penal Code, art 340 ("When several persons conspire to commit an offense . . .").

To the extent Colombia's Indictment alleges that any or all of the subject conduct occurred outside of Colombia, dual criminality with the United States is nevertheless required. TREATY, art. 1(2)(a). The United States has no obligation to extradite for such

extraterritorial conduct if the laws of the United States do not "provide for the punishment of such an offense in similar circumstances . . . ." Id. Just as United States law does not punish the conduct for domestic matters, it has no law punishing the subject crimes if the acts occur outside of the United States.

This Court is not free to re-write the foreign statute to something it is not in a futile effort to create dual criminality where there is none. United States v. Sai-Wah, 270 F. Supp. 2d 748 (W.D. N.C. 2003) (denying extradition due to lack of dual criminality). In Sai-Wah, China (Hong Kong) sought extradition for the offense of Evasion of Liability by Deception. This case presented the second occasion on which the government sought extradition; the previous presiding judge in the Eastern District of New York had declined to certify extraditability. The issue in both instances was whether simply evading a debt was punishable in this country; the government argued it was essentially punishable here as larceny or fraud. The court rejected the government's effort to have the foreign statute read artificially to allow a finding of dual criminality:

> The very nomenclature of the Hong Kong violation "Evasion of Liability by Deception (emphasis added [by court]) strongly suggests this conclusion. Indeed, the name given the offense has to do with evading a pre-existing debt, not commission of fraud in connection with the underlying transaction.

Id. at 751. The court's decision recounts the relevant caselaw and authoritative texts: "[T]he doctrine of 'dual criminality' only allows an accused to be extradited if the charged criminal conduct is considered criminal under the laws of both the surrendering and requesting nations." 270 F Supp. 2d at 750. Since dual criminality is lacking here, extradition is prohibited by the TREATY.

**D.     Colombia has failed to perfect its TREATY obligation to provide accurate translations of the documents it is required to file, Treaty, art. 9 (5).**

Article 9, sec. 5 of the TREATY requires that "All the documents to be submitted by the Requesting State in accordance with Articles 9 and 10 of this Treaty shall be translated into the language of the Requested State."[10] Colombia has failed to fulfill this obligation, both as to the relevant laws,[11] and as to alleged sworn statements on which Colombia claims to rely.

The government here has filed two <u>different</u> sets of documents, translated by different persons, translating the same text differently, and perhaps most problematic, one translator sees text where the other finds text missing.[12] The dueling documents each cast doubt on the veracity of the other, without any clue as to which, if either, is correct or accurate. In addition, a critical statement of Mr. Soghanalian, taken in English as Letters Rogatory in the United States has been provided in a bizarre form, as a third generation re-translation that

---

[10] The documents to be translated include statements of witnesses, as set forth in article 9, sec. 3:

   (3)      When the request for extradition relates to a person who has not been convicted, it shall be accompanied by:

                     * * *

        (b)     Evidence proving that the person sought is the person to whom the indictment or its equivalent refers; and

        (c)     Such evidence as would provide probable cause to suspect, according to the laws of the Requested State, that the person sought has committed the offense for which extradition is requested.

[11] <u>See</u> discussion <u>supra</u> at 5-10 &  n.3-4

[12] The United States made an initial filing of Colombia's documents nearly a year ago, on September 27, 2005. DE 24. A second set of documents was filed about six months ago, February 24, 2006. DE 33. Although both sets of documents were certified as being true and correct, and the translations cover allegedly identical documents, the translations are remarkably different. Colombia has not disavowed either set, leaving dueling documents before this Court.

begins in the middle of the statement and is missing pages of text. The original English statement has not been filed in this cause or otherwise provided by Colombia. A careful analysis of the evidence filed by Colombia reveals that it has failed to honor the translation and filing requirements of the TREATY, making any hearing on these dubious documents completely unreliable on critical issues.

Colombia filed a first submission of documents on September 27, 2005. DE 24. In it, Colombia states – and the U.S. State Department appears to ratify – that these documents, are "duly translated into English and legalized in due form." See id. (diplomatic note E-1458 of August 23, 2005 attached to Declaration of Haley Collums). Colombia also states that the attached documents are "true copies taken from the originals."[13] The critical documents included in the filing are:

1.    The "Declaration of Haley Collums" (U.S. State Department, Legal Affairs) of August 26, 2005, attaching a copy of a second diplomatic note (E-1458) which itself claims to attach the first diplomatic note of May 12, 2005, but does not, and the extradition TREATY;

2.    The "interrogation of Jose Luis Aybar-Cancho," an eleven page document, dated September 19, 2000. This document is in Spanish with an English translation in which the translator notes text missing eleven times on pages 49, 50, 51, 52, 53, 54 (twice), 55, 56, 57, and 58;

3.    The "continuation of the interrogation" of Jose Luis Aybar-Cancho, an eleven page document dated September 30, 2000. The translator notes text missing nine times on pages 60, 62, 63, 64, 65 (twice), 66, 67, and 69;

4.    Another "continuation" of Interrogation of Jose Luis Aybar-Cancho, a three page document, dated November 20, 2000. The translator notes

---

[13] See Prosecution Service . . . Certificate, dated June 17, 2005, which claims that the "382 folios" attached are "true copies."

text missing one (1) time on page 71;

5.    A seven page "continuation" of same, dated November 21, 2000, in which the  translator notes text missing two times on pages 76 and 77;

6.    A six page "extension" of same, dated January 3, 2002, in which the translator notes text missing five times on pages 81, 82, 83, and 84. In addition to the missing text, the witness complains of "inhuman physical and psychological torture" while in jail on no fewer than five occasions. The complaint raises questions about the veracity of the evidence, whether due to torture of the witness or, if the complaint is untrue, based on the witness' proclivity to lie about important events;

7.    A two page "extension" of same, dated April 4, 2002, in which the translator notes text missing on page 85;

8.    Another two page "extension" of same, dated April 17, 2002, in which the translator notes text missing two (2) times on page 87 and 88;

9.    Another "Statement of Jose Luis Aybar-Cancho," a nine page document dated March 23, 2004. The translator notes on page 40, which is the first page of this document, that text appears to be missing at this point. In fact, all the missing text appears to be the answers of the witness. The text begins in the midst of a narrative by the prosecutor. The translator makes the same notation again on the same page and fourteen more times within this document on pages 41, 42 (twice), 43 (twice), 44, 45 (twice), 46 (twice), 47 (twice), and 48 (twice), for a total of sixteen such notations in this document. Parenthetically, Colombia's second submission of this same document used a different translator, who removes most notations to missing text, without any explanation. An astonishing question of the accuracy of the translation – or the identity of the witness – is raised by the third question of the prosecutor, who asks the witness (supposedly Jose Luis Aybar-Cancho), if he has "ever seen, dealt with or talked to . . . Jose Luis Aybar-Cancho." This revealing and discrediting text is masked by the first translator who failed to translate the question, stating instead that the text was missing at this point;

10.   The "Request for Extradition," dated June 17, 2005, in which the translator notes text missing on pages 1 and 2. Although it claims to have seven attachments, it seems to be missing most of them. Only the following documents are attached: Two identical letters from same

author to Dr. Sabas De La Vega, Minister of Interior and Justice (Bogata) and Dr. Hector Sintura-Varela, Legal Department, Ministry of Foreign Affairs (Bogata);

11.    A "Prosecution Service . . . Certificate," dated June 17, 2005, claiming that the "382 folios" attached are "true copies;"

12.    An undated statement of Sarkis Soghanalian, based on "Interrogation by Counsel for the Department of Justice." This statement was given by Mr. Soghanalian in English, but apparently was translated to Spanish, and then translated back to English for purposes of this extradition request. Colombia has filed only a portion of the statement, as a third generation re-translation into English from Spanish. The original statement, which has not been filed or provided here, appears to have been taken in Los Angeles, California, attended by Terri Law of the "U.S. Prosecution Service" [translator incorrectly translated either U.S. Attorney's office or U.S. Department of Justice, since there is no such entity as a U.S. Prosecution Service] "supporting Peru with a Letter Rogatory to obtain" an interview of Mr. Soghanalian "in relation to the criminal case being conducted by Mr. Jose Ugaz, who is present, and who will ask the questions." The first nine pages of the statement are not part of the document filed; the Colombian translator finds "text appears to be missing at this point." Mr. Soghanalian's first words, which appear on page nine after the "missing text," appear as if he is in the midst of a reply. The translator makes the same notation of missing text eleven more times within this seven page document, on pages 17, 19, 22, 23 (twice), 24 (with a notation that the translation is now "from a different document"), 25, 26 (twice), 27, and 33 (with a notation that four of the original pages, 90-93, "are only half photocopied, and cannot be intelligibly translated.")

The second submission of documents by Colombia, nearly six months later, included additional statements and new translations of some of the same documents:

13.    Another "original" statement of Jose Luis Aybar-Cancho, dated September 19, 2000, which is different from the initial translation, see supra at 19, ¶ 2. Colombia's second submission has a different version and translation of the same document, beginning on page 11 instead of 49. The second translator finds some "missing text," which is highly exculpatory evidence, suspiciously the same text that the first translator said was "missing." For example, the second translator finds on page

14 (52 of the first submission), the witness' statement that Charles Acelor-Cokeran (the person who contacted Mr. Soghanalian on Peru's behalf) is the husband of Countess Augusta, whose company Augusta Abel is a well known manufacturer of military helicopters; and that when they were introduced in 1995, Augusta Abel had already been selling to the Peruvian Army in previous years. This newly uncovered text supports the view that the transactions at the heart of the indictment were seen as legitimate by Mr. Soghanalian. Similarly, on page 53 of the first submission text is noted as missing, but is now filled in on page 15 of the second submission; in it the witness confirms that he associated his Peruvian company, Nippon Corporation (implicated in this case as facilitating travel and other arrangements between Peru and Jordan), with Augusta Abel and Charles Acelor-Cokeran, and that Acelor-Cokeran was told that this association was for the purpose of supplying the Peruvian military. Again, this text supports Mr. Soghanalian, the Jordanian government, and others who were made to believe that they were conducting a secret, yet legitimate, arms negotiation with the Peruvian government. The troubling part of these conflicts in the statements is not that the evidence was uncovered, but rather that it was covered-up by the initial translation and that the first translation that was necessarily utilized in drafting criminal charges, since the newer translation did not exist in 2004..

14. Another "original" statement of Jose Luis Aybar-Cancho, dated September 30, 2000, which is different from the initial translation, see supra at 19, ¶ 3;

15. Another "original" statement of Jose Luis Aybar-Cancho, dated November 20, 2000, which is different from the initial translation, see supra at 19-20, ¶ 4;

16. Another "original" statement of Jose Luis Aybar-Cancho, dated November 21, 2000, which is different from the initial translation, see supra at 20, ¶ 5, and adds text in which the witness claims to have been tortured;

17. Another "original" statement of Jose Luis Aybar-Cancho, dated January 3, 2002, which is different from the initial translation, see supra at 20, ¶ 6;

18. Another "original" statement of Jose Luis Aybar-Cancho, dated April 4, 2002, which is different from the initial translation, see supra at 20,

¶ 7;

19.   Another "original" statement of Jose Luis Aybar-Cancho, dated March 23, 2004, which is different from the initial translation, which is explained in some detail, <u>supra</u> at 20, ¶ 9;

20.   Another "original" statement of Jose Luis Ayabar-Cancho, dated April 17, 2002, which is different from the initial translation, <u>see</u> <u>supra</u> at 20, ¶ 8;

21.   A nineteen page deposition of Jose Luis Aybar-Cancho, dated May 23, 2004;

22.   A fourteen page deposition of Luis Frank Aybar-Cancho, dated May 24, 2004. A troubling issue about the veracity of statements and the entire prosecution is raised on page 80 of the statement, which contains an allegation by the witness that statements have been tampered with in this case to the point of removing a prosecutor from the case. The claim is neither addressed nor refuted by the interrogator;

23.   The Colombian diplomatic **note E-742** (the first one), dated May 12, 2005, which was <u>not</u> included in the first submission despite Colombia stating that it was attached (see diplomatic note E-1458 attached to Declaration of Haley Collums, <u>supra</u> at 19, ¶ 1), and which claims to attach "documents that support this request . . . ." These supporting documents are said to be "true copies taken from their originals" according to the Prosecution Service . . . Certificate, referenced <u>supra</u> at 21, ¶11. Thus, Colombia has submitted <u>two different sets</u> of the <u>same documents</u>, both certified as true copies of the originals, but translated very differently.

There are eight statements of one alleged co-conspirator, Jose Luis Aybar-Cancho, totaling fifty-one pages. He is one of the two people who signed contracts for the rifles while representing himself to the Jordanian government and Mr. Soghanalian as a member of the Peruvian military. His statements are replete with conflicting translations and missing and reappearing text. Ironically, many of his statements are exculpatory evidence for Mr. Soghanalian. The balance of the bulk of the evidence relied upon by the Colombian

government to implicate Mr. Soghanalian is his own exculpatory seven page statement, a third generation re-translation with its twelve instances of missing text.

"Text is missing," the most common phrase found in the government's filings, means what it says. This is not noting a missing word here, or a phrase there. Rather, whole tracts of text are excised from the statements: witness answers begin in mid-stream, mid-answer, and mid-sentence.[14]  Whole pages seem excised, some questions and even whole answers.[15] It is thus impossible to avoid the conclusion that the documents provided pursuant to the TREATY are in fact not true copies of the original statements within the "382 folios" which are said to make up the case. The only other alternative is worse – that someone removed, in fifty-two places, a mostly unknown quantity (and substance) of text. It is impossible on the state of Colombia's submission to ferret out the actual evidence on which the Indictment purports to rely. And, certainly, if the Court cannot have confidence in the one, it cannot have confidence in the other.

Confounding the confusing, as we note above, Colombia filed with this Court a "second set of original extradition documents," including translations by a different translator in Colombia, who appears to find some of the text deemed missing by the first translator of the same documents, and who provides thoroughly confusing different internal references to folios and page numbers. It is one thing that two proficient translators may translate the same text differently on occasion, but it is quite another that one sees that text is missing

---

[14]Very rarely is the text of a question missing.

[15]This analysis does not include the numerous places where the translator notes unintelligible text, nor the nearly two hundred instances of mis-translation noted by a Federal Public Defender interpreter.

while the other does not. This is not a case in which two translators are asked to "hear" conversation on a tape recording; here the text is written on paper, so it is either there or it is missing, but it cannot be both. Further, since we know nothing at all about who, what, when, where, why, and how this troublesome conflict in evidence came to be, the Court cannot rule out that the Indictment itself is based on erroneous evidence. And, because the Indictment here is a serial conclusory statement of a prosecutor, the statements purporting to underlie it take on added importance: Conclusory statements cannot satisfy the probable cause standard in an extradition case. See, e.g., Petition of France for Extradition of Sauvage, 819 F. Supp. at 902 (holding that conclusory statements in foreign magistrate's findings filed in support of extradition were entitled to no weight in probable cause analysis); In the Matter of the Extradition of Lehming, 951 F. Supp. 505, 516-17 (D. Del. 1996) (holding that affidavit submitted in support of extradition request did not provide sufficient factual support and therefore could not support finding of probable cause).

These deficiencies and conflicts beg important questions: On which translations should this Court rely? Which translations are erroneous and should be ignored? What text is missing or not? Did the Colombian prosecutor excise or redact original statements or did someone else? Did the prosecutor use redacted versions of statements to fashion the indictment he wrote? Indeed, on which statements did he rely and on which should this Court presume he relied in reaching his legal conclusions about the evidence?

Colombia's failure to fulfill its TREATY obligation to translate properly its filings has left this Court with only highly unreliable evidence. But the law does not require the Court

to rely on such evidence; it may simply dismiss the pending extradition proceeding due to the Requesting Party's failure to comply with its TREATY obligations. See Petition of France for Extradition of Sauvage, 819 F. Supp. at 902; In the Matter of the Extradition of Lehming, 951 F. Supp. at 516-17; International Extradition at 69 ( "[t]he judiciary. . . has the authority to enjoin the federal government from extraditing a person if the extradition is in violation of . . . the applicable treaty") (citing J. Moore, A Treatise on Extradition and Interstate Rendition 97 (1891)).

**E.    Colombia has failed to demonstrate that the offense alleged in its Indictment is not simply a political or military offense, for which extradition is barred by the TREATY, art. 4.**

The TREATY does not permit extradition for political or military offenses:

### ARTICLE 4

### Political and Military Offenses

> (1)    Extradition shall not be granted when the offense for which extradition is requested is of a political character or is connected with an offense of a political character, or when the person whose extradition is requested proves that his extradition is requested for the exclusive purpose of trying or punishing that person for an offense of the above-mentioned character.

> (2)    Extradition shall not be granted when the offense for which extradition is requested is of a purely military nature.

TREATY, art. 4. Although the Executive Authority of the Requested State may decide on the application of this article, id. at (3), laws of the Requested State may provide otherwise, and the person for whom extradition is sought has standing to raise the issue. See TREATY, art. 4(1).

The Indictment in this case alleges both political and military offenses. In short, it

26

alleges that the government of Jordan sold surplus arms to Peru, through an internationally recognized arms broker, Sarkis Soghanalian, but that corrupt Peruvian government officials diverted the arms to Colombian nationals who the current Colombian government denominates as political rebels. Colombia has filed no reliable evidence that either Jordan or its arms broker participated in the diversion. For them, it was a legitimate arms deal between sovereign nations, arms designed for the protection of those nations. Nevertheless, the Colombian Indictment charges Mr. Soghanalian with a crime resulting from this activity: "Conspiracy to Commit an Offence and Trafficking in Arms Reserved for the Use of the Armed Forces." Indictment, DE 24. The very title of the charge denotes this as a military or political offense. In a case such as this one, with sworn allegations as are contained in the Indictment and statements, Colombia must demonstrate that the extradition does not involve political or military offenses. It has failed to do so. So extradition is prohibited by the Treaty, see generally, International Extradition at 676-78 (citing cases prohibiting extradition for military offenses), particularly where the charged foreign crime is not a crime in the Requested State. Id.; see supra at 10-18 (dual criminality lacking in pending Indictment); see also International Extradition at 587-675 (general discussion and citation of caselaw of political offense exception to extradition).

## CONCLUSION

The Court's function in this extradition proceeding, as set forth in the TREATY, includes determinations of: (1) Whether there is a proper charge; (2) Whether the offenses charged are extraditable; (3) Whether the requirement of "double criminality" is satisfied; (4) Whether the required documents have been presented, translated and duly authenticated

by the United States Consul; (5) Whether all other TREATY procedures have been followed; and then, (4) Whether, there is probable cause to believe that Mr. Soghanalian committed the offenses charged. See In re Extradition of Rabelbauer, 638 F. Supp. 1085, 1087 (S.D.N.Y. 1986); Austin v. Healey, 5 F.3d 598, 605 (2d Cir. 1993); Spatola v. United States, 925 F.2d 615, 617-18 (2d Cir. 1991); Messina v. United States, 728 F.2d 77, 80 (2d Cir. 1984). A court hearing an extradition request that is supported by an affidavit or other conclusory statements, like the Indictment in this case, must engage and require the presentation of sufficient underlying evidence to support those conclusory statements, because the court will not act as a "rubber stamp" for a requesting government. United States v. Lehming, 951 F. Supp. at 517; Freedman v. United States, 437 F. Supp. at 1265 (magistrate "should involve himself in a determination as to the reliability of the affidavits presented and not merely blindly believe such statements without regard to the underlying facts upon which the officer believed that the information was reliable").

Before the Court may address the question of whether probable cause exists to grant an extradition request, however, it must be satisfied that the TREATY requirements have been met. Here, for the reasons set out more fully above, the TREATY requirements have not been met, making it impossible for the Court to conduct the required proceedings with the requisite reliability. In addition to the unreliability of the documents and evidence, extradition is prohibited by the TREATY itself for four independent reasons: The alleged Indictment was improperly issued by an unauthorized person, the alleged crimes lack dual criminality, and Colombia seeks to punish political and, separately, military offenses.

## GOVERNMENT'S POSITION

The U.S. government is apparently aware of the deficiencies in the present filings. At each of the last two status conferences in this case, government counsel advised the Court that the U.S. government had, though diplomatic channels, asked Colombia to provide a proper packet of materials to support the extradition request. At the April 4, 2006 status conference, counsel for the government announced that Colombia had previously been asked to provide additional documentation, but it had failed to do so. Government counsel requested that the next status conference be set seven weeks hence, to allow sufficient time for Colombia to respond. On May 25, 2006, government counsel again announced that Colombia had still not provided the requested documents and revealed with great candor that the present filings lack probable cause:

> [AUSA] MS. OSBORNE: Pretty much the situation we are in, Your Honor, is that the Office of International Affairs has delved a little bit deeper into the problems with the documents from Colombia.
>
> They are aware that there is a problem. They are aware that there is a lack of probable cause and the OIA is actually sending some lawyers down to Colombia to try to work on these problems with the Colombian Fiscaleria and get together a packet.
>
> Now that's not something that is going to take a lot. I think that will take actually several months before it is accomplished.
>
> So what I would ask the court is to give us one more continuance, and then potentially we will discuss a dismissal without prejudice on the next date.

Transcript of May 25, 2006 Status Conference, DE 38 at 3 (emphasis supplied). Government counsel then sought a 90 day continuance, which the Court granted, setting a new status conference for August 17, 2006. That date is just days away, yet Colombia has failed to

rectify any of the deficiencies in its filings.

## RELIEF SOUGHT

The extradition warrant and proceeding should be dismissed.

KATHLEEN M. WILLIAMS
FEDERAL PUBLIC DEFENDER

By: _____

Paul M. Rashkind, Supervisory
· Assistant Federal Public Defender
Attorney for Mr. Soghanalian
Florida Bar No. 203688
150 West Flagler Street, Suite 1500
Miami, Florida 33130-1555
Phone: (305) 536-6900
Fax: (305) 530-7120
E-mail: paul_rashkind@fd.org

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing document

was delivered by mail this 11th day of August, 2006,  to Susan R. Osborne, Assistant United

States Attorney at 99 N.E. 4th Street, Fourth Floor, Miami, Florida 33132.

By: _____

Paul M. Rashkind

# **FAXBACK SERVICE LIST**

Paul M. Rashkind, Supervisory
Assistant Federal Public Defender
Chief of Appeals
150 West Flagler Street, Suite 1500
Miami, Florida 33130
Tel: (305)536-6900, ext. 205
Fax: (305)530-7120


Susan R. Osborne
Assistant United States Attornye
99 N.E. 4th Street
Miami, Florida 33132
Tel:  (305)961-9100
Fax:  (305) 536-7213
Counsel for the Government